If it pleases the Court, 28 U.S.C. 455A requires a District Court Judge to sua sponte the following recuse themselves if their partiality could be reasonably questioned. Now, 455B and 455C lay out additional instances where recusal could be used. You rest now just on 455A, right? Correct, Your Honor. We rest on 455A, although we certainly would propose that if somehow 455A were viewed as not requiring recusal, that the spousal connection that is listed in 455B and 455C would also dictate recusal. But we think the primary, most straightforward application is 455A. What about the timeliness question that was raised by the District Court? I think you said in your brief that she didn't rest on that. I read her as resting on that. I read her as relying on that. She didn't say, I'm not going to rule on that. She ruled on that. So if that's the case, what's your response, particularly with respect to all the matters other than AJAX? With regard to all the matters other than timing? Than AJAX, the timing issue. The timing issue, the idea that Selspin somehow knew about this all along and waited until this bad summary judgment motion to spring it on the court and try to avoid this argument with the court is false. Well, if this information was available for years, something must have triggered if you say that you had no reason to look at it. So what was the timing of that? What triggered it internally for our side was the decision, I think it was the centripetal case that caused us to look closely at this issue combined with the District Court's disclosures and the publication of those in combination with these new revelations as to the spouse of the District Court relationship with certain companies. So when those pieces started to fall together, we certainly investigated it and we realized it was after the summary judgment motion. The timing was less than perfect, admittedly. We certainly wish we would have had that information earlier, but nevertheless the District Court had the information and 455A doesn't call upon the parties to bring it to the District Court's attention. So the District Court, certainly at the time that Google was advertised as purchasing and owning Fitbit, which is a defendant in the case, should have alerted the District Court to the fact that, wait a minute, I have millions of dollars invested in an index fund that holds Google. My spouse does extensive work for companies that have very large funding from Google. These facts don't look good. A reasonable observer under 455A might call my partiality into question. At that point, it was incumbent upon the District Court, not Selspin, to raise these issues. We did raise the issues as soon as, again, all the facts came to our knowledge and presented them to the District Court. As you know, the District Court didn't reject out of hand and base the decision to deny recusal based on timing, but based on the subjective facts that the District Court entered into the record to essentially rebut the facts that Selspin presented, which would be available to the reasonable public observer. Now, the standard would be not the subjective belief of the court as to whether or not there is an actual bias. Cases are very clear that it's an objective standard based on what information would be available. Can we just get back for a moment to the timeliness question? Google acquired Fitbit in February of 2021. Correct. And that was a matter of widespread public knowledge. And I don't think you have denied that you knew about that acquisition roughly when it happened. Absolutely. And so from then until the summary judgment proceeding is a year and some months, the AJAX situation is different. If I remember right, Judge's husband joined AJAX in March of 2022. Correct. Either the motion had just been filed or the summary judgment was about to be filed. What do we know about the availability of knowledge of that? I assume that the amount of publicity about him joining AJAX didn't match the amount of publicity of Google acquiring Fitbit. Was there? It wasn't front page news, certainly, which is part of the reason why. Does the record say anything specifically? It says you didn't learn about that until November or something. It was later in the year. November sounds about right. Do you have to know when his LinkedIn page revealed? I don't know the date of the LinkedIn update. Certainly, again, I'm sure that's a matter of public record or on a way back, perhaps, as to when the timing of that. What I do know is that CELSPN investigated, began to look into, okay, what are these dealings of the spouse of the district court judge? This is now, I guess, not so much timing. This is really focused just on the AJAX piece of the case, which it feels like is in a category of its own. What do we know about how much of the funding of AJAX comes from Google itself as opposed to, I'm remembering, there's a vaguer phrase, Google and others. That might be a very different situation if it was 90% Google and 10% others as opposed to the other way around. Do we know? I don't believe we know the specific breakdown. We do know that I believe, off the top of my head, I believe it's $700 million as a total investment. That's the total investment into AJAX. Total investment, yes, by Google and its affiliating. I'm sorry to interrupt, but is that investment directly to AJAX to distribute to the companies under its umbrella organization? When you say AJAX, do you mean the companies that are related to AJAX? The companies, my understanding is AJAX essentially owns these companies. Owns these companies? My understanding is yes. They're venture capital that have investments in all of these companies. To the extent the funding is to the companies, it's inseparable from AJAX. Our point is simply that however the nuts and bolts of the funding might work, the public perceives one thing. That is that we have a spouse of a district court judge who is hearing a case involving Google as essentially a defendant because it owns Fitbit. We have a spouse who clearly has incentive with Google to further Google's business interests. Well, as you said, I interrupted Judge Duranto who was trying to discern how much of the $700 million. I think there's nothing in the record to show whether Google's interest is $3 or $300 million, right? Fair enough. We don't know the exact amount. And nothing in the record specifically about essentially the flow of the money, whether the Google consortium gives $700 million to AJAX, what happens to that money? Does AJAX now have possession of it under instructions about how much of it needs to be used to provide seed money for the various startups? AJAX, how does AJAX pay its bills? How does AJAX pay its bills? Including whatever this contract is with the judge's husband. I do not know the details of how AJAX compensates. Is there an allegation that part of the Google consortium investment pays AJAX's expenses? I believe our contention would be that a reasonable assumption based on these facts is that the spouse's position within AJAX is such that he has incentivized for all of these companies to succeed to the greatest extent possible using, obviously, Google funding. Do I remember right that Judge Rogers' opinion, I think you said her husband has equity in AJAX and the response was he doesn't have equity in the startups. I don't think she ever said he doesn't have equity in AJAX and she said he's not an employee of AJAX but is a contractor. Is that the sum total of what we have in front of us? For him to be called a contractor of AJAX, I'm not sure what that means exactly. We do know that his public LinkedIn information identifies him as an operating officer. Operating partner or operations partner, one of those two. So that would belie a contractor relationship. If you don't know what the contractor is, then how does that help you with respect to showing the financial interest under section A of the statute? I think how we would answer that question is, again, the background information that the public is not privy to is not how the inquiry is supposed to proceed. The inquiry proceeds by, under 455A, totality of the circumstances, this being one fact of many. When you layer these facts on top of one another, whether there is a contractor relationship with AJAX... If this fact doesn't help you, it hurts you. How so, your honor? You've argued here that you don't know what the contractor does or what a contractor is. The public has no idea he's a contractor. The public looks at his LinkedIn profile... You're making assertions, and you're the one that's using what's essentially a legal term. But you don't have, apparently, the evidence to back that up one way or the other. We don't know, and that is part of the 455A problem. If you don't know because you don't have evidence, how do you expect the public to know? That's the point, your honor, is that the public doesn't know. The public perceives that there is a clear financial relationship between Google and AJAX and the AJAX company. That fact is undisputed. The public perceives that Mr. Rogers has this position within AJAX based on publicly available information. Operating partner. Now, to what extent his compensation is actually tied to Google? Not a matter of public knowledge. We don't know. Does the public know how much Google may have funded? I still don't know whether it's AJAX or whether it's any one of the companies under AJAX. Does the public know that? The public doesn't know. Our position on this is, again, the AJAX question is one of many facts that must be considered. You said that a few minutes ago. Sure. By one of many facts, do you mean the other things you've alleged? Correct. What if they come off the table easily on a timeliness ground and you're just hypothetically, you're just left with AJAX? Then all of that argument drops out, correct? If we are precluded from making a recusal argument based on timing and are limited to only the AJAX question, if I understand your Honor's question correctly, then we would still suggest that public perception would a reasonable observer call into question the bias of the district court judge in light of the facts. My recollection, tell me if I'm wrong, is that the standard for a 455A or the general impartiality might reasonably be questioned. It always comes with knowing all of the facts. That is, you can't get, to put it too crudely, the ignorant person's general impression. We posit that all the facts are known. What are we supposed to do in a situation where there are all kinds of facts that feel like they might be relevant that are just unknown? You're not making an argument that more discovery was needed. I don't even know if discovery is done in a 455 situation. I don't know how discovery could be done. The question that, to answer your Honor's question, yes, you don't take the extreme person who only reads at one and does nothing else. I believe the case law would say that the opposite end of the spectrum is not the test either. It's a reasonably inquisitive person, not someone who is hyper-inquisitive and who would turn over every rock and stone to investigate what is going on in the background. We have this average reasonable observer standard. What, in your view, does an average reasonable observer know about the relationship with AJAX? It knows that maybe Google gave something, but we have no idea how much. We don't know who Google gave it to. You mentioned to me in responding earlier that AJAX owns all of these companies. I may have misspoke on that, your Honor. The relationship between AJAX and the AJAX companies, I'm not fully aware of. You also mentioned it owns, and then I think you said it has equity. I didn't see anything on the record with regard to that. These are AJAX-affiliated companies that AJAX is the VC for. Our connection is literally what we have presented that a public observer would know, and those are the publicly available facts of the press releases, the statements about the funding, the position of Mr. Rogers within the company, and the relationship of the companies to AJAX. Do you have any evidence of how much, if any, money from Google actually flows through AJAX? We don't have that breakdown. Okay. That's key. Can I ask you, this is not about the details. This is about harmless error, so at least for 455A, probably even for 455B as well, but I think we're essentially talking about 455A here. There's a well-established harmless error test that needs to be applied. Our shell case, the Supreme Court's Liljibird case, right? So I'm thinking about this. Let's just assume for a minute, okay? Now I'm looking back to the case that we just heard argument in. Assume that we agree as to Garmin that the OAuth problem is a decisive problem. That is a decisive problem for infringement, that summary judgment as to Garmin was properly based on that because the identification was too late. Garmin is not here in this appeal. Garmin, therefore, does not have a, is not subject to any live objection that decision-making as to it was somehow adversely influenced by the Google problem. At that point, for Fitbit, the OAuth lateness actually disposes of the Fitbit case. That ground is sufficient to support summary judgment. Why does that not mean that any difficulty of a 455 nature that there might be is harmless because the result is foreordained from a proper decision on the OAuth as to Garmin? And I'll add Fossil also.  If I understand Your Honor's question, we would counter that by saying that the district court's view on OAuth is consistent on the OAuth theory and on the application of specific source code implementations for all the defendants, including Garmin. The theory that the district court used is consistent for all three. Namely that somehow the original contentions were not broad enough to include these specific applications. So the application as to Fitbit on the OAuth question is identical to the application that the court took with respect to Fossil and Garmin. So the approach that the court took with respect to Fitbit would be tainted by the 455 question, and therefore the identical approach that the court took with regard to the other defendants would likewise be tainted. And we think there's case law, and we cite it in our brief. The trouble is, putting aside Nikon for a second, you did not preserve by appealing any challenge based on 455 as to any of the other defendants. Nikon is here, but we're about to hear about why it shouldn't be here. But putting aside Nikon, Garmin and Fossil are undisputedly not here as to this. So there is no 455 objection to them. You originally made one, and the district court said that the problem with the relation to Fitbit taints the rest, but you don't have that anymore. There is not a specific 455 objection as to Garmin, if I understand Your Honor correctly. I think that's correct. Now, we would, and I believe we cite it in our briefs, that once the 455 question gets resolved in favor of recusal as to any defendant, that recusal as to the entire case is the proper remedy. And so I believe that is the law on that point, and we would stand on that law. Do you have anything briefly to say about Nikon, why, in your view, it should be here? Or do you agree now that it shouldn't be here because there is not actually a notice of appeal filed in the Nikon case? Well, I think I would probably just stand on a brief on that point. We think that all of the information, the district court summary judgment order was to all defendants. The appeal that was filed was filed in each and every case. So the idea that somehow one defendant was excluded is incorrect. The district court certainly resolved all of the matters in its MSJ order and repealed. The appeal is, in effect, to all defendants, so all defendants are properly here. Good morning, Your Honors. Adam Steinmetz for the defendant appellee Fitbit. Only the defendant appellee Fitbit. I don't speak for any of the other defendants, unlike in the previous case. Your Honors, from Fitbit's perspective, this is a motion that should not have been filed, and once it was denied, it's an appeal that should not have been filed. The district court, obviously, Your Honors, are familiar with the opinion. She called it extreme and meritless, an attack on the judiciary. Let's assume that at least as to AJAX, I don't share that characterization. Yes, that's fair, Your Honor. It does sound like Your Honors have identified the timeliness requirements and the problem with respect to the other issues. With respect to AJAX, Your Honor, I think Your Honors hit on it during your questioning of opposing counsel on this, which is, yes, sir? If we find that the motion was untimely, does that affect the argument you're about to make? I think the motion was untimely with respect to the requirements for timeliness and the concerns that have been raised by the Ninth Circuit and other circuits, which is that litigants are going to use the judicial ethics rules as a litigation strategy to gain tactical advantage. If Your Honors find that that's what happened here with respect to any of the allegations, then the fact that there may have been, I'll call it later breaking news with respect to AJAX because it was, as Your Honor identified, well before this motion was filed, but the fact that there was one piece of the motion that was then included among four allegations, I don't know that that saves the salesman from the concerns that underlie the timeliness requirement. No, no, no, but I understood, Judge Duranto. I was just asking you, let's assume that there's not a different timeliness problem, if any, with respect to AJAX. Yes. What do we do with that? Absolutely. I was just addressing Judge Raina's question in that we feel that the timeliness problem is that this was strategic overall and that AJAX is a conveniently later application than the others. But with respect to AJAX, Your Honor, I think the problem, as Your Honors identified, is that the recusal requirements are based on what a reasonable observer would know, and the allegations here are based on apparently what a reasonable observer would not know. They don't have evidence. They've attempted to shift the burden to the judge, to the defendants. Their briefs are replete with. Well, just as a procedure, how is this supposed to work when there's a very limited amount of public information? So we know this is a venture capital firm. That's what the website says. There's sort of general knowledge about, not in my mind, but in Silicon Valley maybe, about how venture capital firms get their money, how the firm pays its expenses, how the firm invests and what the relationship is between the startup and the financier. How is there some procedurally when you file, when you say this, you know, boy, this raises a lot of questions. Does Selzman have a route to get more facts or what? Your Honor, I don't know what their route would be to get more facts about this, whether it would be to serve subpoenas or to raise this as an issue with the district court and then seek discovery on it. I don't have a suggestion as to what the route is. What I do know is that the law requires a substantial heavy burden on the party that's seeking to disqualify the judge. I agree that 455 is self-fulfilling, that the judge is under obligation to recuse if she feels that there is a reasonable perception of bias. But as the party bringing in a motion... Your Honor, just to be clear, sometimes it's not just how she feels, right? Sometimes the appellate court says you felt wrong. Absolutely, Your Honor. Yes. The law does require, as the party bringing the motion and seeking to disqualify the judge, that there is a burden on the party that's seeking that to provide evidence, to provide facts, not speculation about how tranche investments work or how certain partner benefits... But in deciding whether that obligation has not been fulfilled, I guess I sort of want to know how might it have done better? Well, again, I... If there's no alternative, then, you know, what more can you do than say, this is kind of the way the venture capital funding mechanism works when you have a gigantic company with lots of money and it's interested both for doing public good and for maybe buying some startup if it pans out. We're going to give a lot of money and there are these professionals who are very good at spending their time trying to suss out, separate the good from the bad. Your Honor, again, I don't have a specific mechanism that could have been used, how they could have done better. I will say in this case, separating this from a different case where there is a venture capital firm at issue, in this case in particular, Your Honor asks, do we know how much money Google invested? And as you said, they put in their brief, it's Google among others. If Your Honor is in the appendix, and this is at appendix 141, 174, and 178 with respect to the specific portfolio companies, Google is mentioned, as they know, among others, including, for example, on 141, particularly for, this is for the planet company, the portfolio company planet. Google among Koch Industries and Time Ventures and BlackRock, there is no evidence in the record as to how much Google would have invested in these. And the problem with the allegation is whether or not they could have done better, judges are presumed to be impartial. It is the judge's job to maintain, as it is for any judge, to maintain a knowledge of what financial interests she has and the financial interests of anybody in her family. There is no allegation that she failed to keep apprised of her husband's employment or anything of that nature. She was well aware of these facts, as a reasonable observer would be well aware of these facts, and based solely on the evidence that has been provided by Selspin, it's Google, I'm on 178 now, appendix 178, Ripple Foods raised money from Google, Coleslaw, S2G, Tao, Soil Disease Testing. There are, allegations are simply not specific to Google at all, and to shift the burden to the judge and to the defendants, the brief constantly says the judge didn't deny this, the defendants didn't deny this. Your time runs out. Can you address Judge Taranto's question to your friend with regard to why, I don't want to use the word moot, it's not moot, but why the grant of summary judgment against companies that are not affected by this directly? Your friend said, well, everything was tainted, even though Nikon didn't appeal, and whatever, everybody's tainted automatically. What's your response? Our response is that it's harmless error under all three of the Lilleberg factors, particularly in this case, the appellate process has been played out. Your Honor's just heard oral argument in an appeal in which all of the defendants are here to defend themselves. In this case, there's only an appeal as to one of the defendants, BitBit. Nikon will represent itself and affirm that they're not properly here, but as Judge Taranto noted, the summary judgment is going to be, if Your Honor has affirmed the summary judgment on grounds that are overlapping with FitBit, then even if not under the law, even if there were something to vacate, on a factual basis, sending it back to the district court to simply rubber stamp it because the same reasoning would apply to FitBit, we would agree that the first harmless error factor weighs in favor of not vacating the summary judgment, even if there is a 455 problem. The second Lilleberg factor is the impact on other litigants. The other litigants are not here to defend themselves in this 455 appeal, and that is critical because they'd be prejudiced by having the entire summary judgment order thrown out on the basis of allegations or an appeal directed solely at FitBit. And I think I'd be remiss if I didn't mention the third summary judgment factor, which I think the impact on the public perception of the judiciary, if this type of conduct in delaying to bring a motion like this and then that results in vacating an entire summary judgment order as to multiple defendants because of allegations that are late brought against one defendant would be drastic on our view. So I don't know if I've responded to every question. Unless the court has other questions, we're happy to rest on our briefing as to the specific issues. Okay. Thank you. May it please the court, Seth Lloyd for Nikon. Just briefly, Your Honors, because Celspin failed to file a notice of appeal in a separate case against Nikon, it deprived this court of jurisdiction to grant any relief in that case. And it's clear from Celspin's notice of appeal, this appendix 2167, the notice of appeal identifies only the FitBit action as the action being appealed, names only FitBit. It was docketed only in the FitBit case. And Celspin paid only a single filing fee, docketing fee, in the FitBit case. So there is no appeal from the case against Nikon. And so the order that was entered in the Nikon case is now final and unappealable and cannot be altered by this court because Celspin deprived the court of jurisdiction. Can you remind me, if you know, how did you get into this caption? When we responded, when we filed our opposition to Celspin's recusal motion, our response initially got put on the FitBit docket. And so then we got listed in the caption of the FitBit docket. And at the time that this appeal was filed, we were still listed in the caption there. We contacted the clerk's office after we got listed on the docket for this appeal, and they've corrected that we're no longer listed on the caption. In the district court docket? In the district court docket, yes. But we're still listed on this court's docket. So for all those reasons, we agree with FitBit. The court should affirm for the reasons FitBit said, but at the least, it lacks jurisdiction to grant any relief in the case against Nikon. Thank you. You ran out of time. We'll restore two minutes, Mr. Folk. I'll be brief, Your Honor. Thank you. As to Judge Stronto's question to my friend, what more can a litigant do? A motion under 455 is not something that should prompt a discovery investigation into the finances, the interests, the investments of a district court judge. I don't believe that is appropriate or required under the rule at all. And you don't have any reason to, I mean, you know if such investigations have not been conducted in the past? I'm not aware of any case in which that investigation has been done, and certainly as a litigant I don't know that that would be necessarily proper. I would fall back to 455A, which doesn't call, doesn't require that type of investigation. It only requires, as we've mentioned repeatedly, the reasonable observer, and a reasonable observer would not have that information. A reasonable observer doesn't conduct discovery into these matters and send subpoenas. So I think the public is aware of what is publicly available, and that's what CELSPN relied upon, that's what CELSPN presented. Now, very briefly on the Nikon question. They're here, they filed a red brief, the notice of docketing in the Nikon case. They didn't have a lot of choice about filing the red brief once they were put in the caption here. Well, they are, the Fitbit cause number and the Nikon cause number are listed in the notice of docketing as filed in the Nikon district court case. The order of recusal unequivocally included all of the district court case numbers, including Nikon. So the Nikon's presence here is proper for the same reason all of the defendant's presence here is proper, and we would again point to our briefing and just rely on the arguments that are set forth in our reply. Thank you. Thank you, Your Honor. We thank all parties, the cases submitted.